**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ARLENE ROSARIO and**
**GEANENE SILAS, on behalf of**
**themselves and others**
**similarly situated,**

**Plaintiffs,**

           **Civil Action No. 6:20-cv-352-WWB-EJK**

**v.**

**PROGRESSIVE CASUALTY**
**INSURANCE COMPANY,**

**Defendant.**
_____/

## DEFENDANT'S MOTION FOR DECERTIFICATION

  Defendant Progressive Casualty Insurance Company ("Progressive") moves to decertify this conditionally certified Fair Labor Standards Act ("FLSA") collective action.

**I. INTRODUCTION**

  Plaintiffs are licensed insurance claims adjusters who work(ed) for Progressive as a Medical Rep Associate (Level 37) and/or Medical Rep Intermediate (Level 39) (collectively, "medical reps") in Florida. The issue in this case is whether Plaintiffs are exempt from overtime under the FLSA's "administrative employee" exemption.

  As detailed in Progressive's pending Motion for Summary Judgment, all eight Plaintiffs who were deposed in this case admit they, and all other opt-in Plaintiffs, performed exempt work. Plaintiffs' deposition testimony, job descriptions, ClaimStation notes, and performance evaluations all confirm their primary duties were to independently investigate, evaluate, and render decisions on whether to approve or deny claims under Florida's personal injury protection ("PIP") statute, and they were properly classified as

exempt. As a result, Progressive is entitled to judgment against all Plaintiffs as a matter of law. If, however, the Court finds that just one Plaintiff was properly classified as exempt, or that the case for some Plaintiffs is stronger or weaker than others, the case also should be decertified because the outcome necessarily turns on an individualized inquiry regarding Plaintiffs' work and duties.

In opposing summary judgment, Plaintiffs point to the testimony of two named Plaintiffs and a minority of opt-ins that they merely "process" claims pursuant to largely unidentified but unalterable "templates," and that they make no independent choices. This testimony, even if true, reflects that these individuals consciously chose to disregard Progressive's expectations and to perform a different job than the one they were hired to perform – not that their jobs did not require the use of independent judgment and discretion.

Thus, if the Court elects to deny summary judgment, Plaintiffs' own arguments reflect that individualized evidence, credibility and liability determinations, and individualized defenses, will be necessary to resolve each of their claims. First, Plaintiffs' opposition to Progressive's summary judgment motion highlights the alleged variance in Plaintiffs' decision-making, their use of templates, and the supervision they experience. These alleged differences alone warrant decertification. *See Julian v. MetLife, Inc.*, No. 17-cv-957, 2021 WL 3887763, at *3 (S.D.N.Y. Aug. 31, 2021), *leave to appeal denied sub nom. McKinney v. Metro. Life Ins. Co.*, No. 21-2209, 2021 WL 7451180 (2nd Cir. Dec. 21, 2021) (decertifying collective of claims specialists because, as a result of plaintiffs' varied testimony regarding their individual circumstances and how they completed day-to-day tasks, "a factfinder would be unable to determine that all plaintiffs in the collective are

either exempt or non-exempt in one swoop"). Second, should this case proceed to a collective trial, Progressive will assert different, Plaintiff-specific defenses that cannot be litigated with common proof. As courts in this circuit and elsewhere have recognized, it would be improper for a factfinder to reach a one-size-fits-all verdict that binds all Plaintiffs and Progressive when, as is true here, Plaintiffs are not similarly situated because some Plaintiffs claim they chose not to perform the job they were hired and expected to do. As a result, a fair trial would require most or all opt-in Plaintiffs to testify about their allegedly varied experiences and be cross-examined on Plaintiff-specific defenses.

For these and the other reasons set forth below, in the event the Court denies summary judgment, it should decertify this collective action and require the opt-in Plaintiffs to proceed individually.

## II.   RELEVANT PROCEDURAL BACKGROUND

Notice of this action was sent to hundreds of current and former Progressive medical reps across the State of Florida. Only 31 individuals filed consents to "opt in," and nine subsequently withdrew from the case (two were actually time-barred). Plaintiffs engaged in extensive discovery, including 10 depositions of management personnel and a 30(b)(6) witness, while Progressive deposed the two named Plaintiffs and six opt-in Plaintiffs. The parties produced and exchanged hundreds of thousands of pages of documents. After the close of discovery, Progressive moved for summary judgment against all Plaintiffs in this collective. Briefing on Progressive's motion concluded and the motion is ripe for the Court's consideration.

III.     **RELEVANT FACTUAL BACKGROUND**

A.     **Progressive's Expectations For The Medical Rep Position**[1]

In opposing summary judgment, Plaintiffs do not rely on class-wide evidence, as that evidence establishes that they were properly classified as exempt. Indeed, several Plaintiffs confirmed in their depositions that they investigate, evaluate, and render decisions on whether to approve or deny PIP claims. Plaintiffs decide whether a claimant is covered under the applicable policy, their injury is causally related to the accident, and—most importantly—whether to approve or deny the claim. Joiner 54:8-54:17, 59:22-60:16, 122:19-122:22;[2] Silas 30:5-30:7, 55:13-55:20, 99:12-99:20; Tirado 23:19-23:20, 34:21-35:8, 36:20-36:23; Garretson 25:20-26:7; Hatoum 49:11-50:9, 53:18-54:4, 98:23-98:24, 122:13-122:18; Walker 35:23-36:1. Plaintiffs are expected to, and do, make decisions resulting in the payment of millions of dollars in benefits every year. Joiner 72:7-72:10; Hatoum 83:8-83:11.

Given that no two PIP claims are alike, whether Plaintiffs approve or deny the payment of benefits depends on the facts and circumstances of each claim. Garretson 37:18; Silas 81:19-82:21; Joiner 56:16-56:22, 108:23-108:24, 123:10-123:13. Initially, Plaintiffs must make the threshold decision, based on the specific policy language and facts presented by each claim, whether the claim is covered by the applicable policy. Garretson 25:20-26:7; Hatoum 122:13-122:18. To determine whether a claim is covered, Plaintiffs may have to evaluate records to confirm the date and location of the accident,

---

[1] Progressive set forth a detailed description of the duties and expectations of the medical rep position in its Motion for Summary Judgment, which it will not repeat at length.

[2] Transcripts from Plaintiffs' depositions are cited as "Name Page No.: Line No." Plaintiffs submitted their full deposition transcripts with their Opposition to Progressive's Motion for Summary Judgment (Doc. 131), and Progressive submitted each deposition exhibit cited with its Motion for Summary Judgment (Doc. 125).

and interview claimants and witnesses. Hatoum 79:15-80:20. Then, to determine whether to approve or deny the claim, Plaintiffs review and apply, among other things, medical records, police reports, and additional information provided by claimants, their doctors, and others. Hatoum 98:23-98:24 (she "ma[de] a determination . . . as to whether [the claim] is to be paid or not" based on information she learned during interviews with injured party and their doctors, and her review of medical records and police reports).

Depending on the facts and circumstances, still more exempt tasks may be required during the course of a claims investigation, as many Plaintiffs confirmed:

- Determining whether additional information is necessary and evaluating whether the claimant's treatment is causally related to and consistent with the accident. Tirado 112:5-112:16; Joiner 74:22-74:24, 102:7-102:14; Garretson 25:18-28:1; Hatoum 117:19-118:10, 119:12-120:1; Walker 37:22-37:25.

- Determining whether a claim requires additional investigation by the Special Investigation Unit ("SIU"). Joiner 75:23-76:7; Tirado 24:21-25:8.

- Determining the type and amount of benefits, including whether the claimant is entitled to non-medical benefits like lost wages and transportation costs. Hatoum 21:12-21:21; 25:8-25:10, 81:7-81:18; Tirado 26:10-26:16, 35:13.

- Deciding whether to interview the claimant's health care providers, family members, or employer to obtain information relevant to the claim. Hatoum 85:1-85:3; Joiner 69:25-70:13; 72:11-73:20.

- Deciding what questions to ask during interviews and what approach to take to get the most accurate answers. Hatoum 56:9-56:24, 59:4-60:8; Joiner 68:1-68:4, 78:4-78:14; Garretson 47:25-48:15; Tirado 86:3-86:14; Walker 73:14-74:18.

- Determining whether to order Independent Medical Examinations ("IMEs"). Hatoum 101:3-101:6; Tirado 116:5-116:16; Joiner 60:19-60:24; Garretson 71:14-71:18.

- Resolving coverage verification questions ("CVQs") and creating additional CVQs when they deem it appropriate which, if "cleared," result in a claim being covered. Hatoum 63:24-64:13; Joiner 170:22-171:9; Tirado 38:12-38:15.

- Training, mentoring, and coaching less experienced medical reps. Tirado 28:24-29:3, 38:19-38:24; Walker 22:19-22:20, 28:8-28:10; Joiner 104:19-105:15; Garretson 37:4-37:7; Hatoum 40:1-40:2; 41:12-41:21.

The job descriptions for the Medical Rep Associate and Medical Rep Intermediate positions reflect many of these exempt tasks. Silas Dep. Exs. 10 and 11. Almost every Plaintiff who was deposed confirmed these job descriptions are accurate. (Doc. 125 at SOF ¶¶ 5-6). What's more, "Working Independently" is a specific metric on the evaluation form for both positions. Tirado Ex. 4. Several Plaintiffs confirmed they performed their work in line with Progressive's expectations for these positions. *See, e.g.*, Walker 33:8-33:18 (a good medical rep is "self-led and can work without a supervisor telling them how and when to work"); Joiner 139:17-139:19 (working independently is part of her job); Garretson 68:1-68:4 (good judgment and discretion are important traits of successful medical rep); Hatoum 130:11-130:14 (understood she must use independent judgment to make claims decisions). Because the class-wide evidence supports the exemption, Plaintiffs rely on individualized issues and the experience of a few Plaintiffs to suggest that none did exempt work.

**B.**    **Some Plaintiffs Claim They Chose To Disregard Progressive's Expectations For The Medical Rep Role**

Despite Progressive's clear expectations for the medical rep position, Rosario and Sousa claim they chose to perform a different job. Despite being told repeatedly that she needed to exercise independent decision-making, Rosario testified she merely collected information at the direction of her supervisor. Rosario 53:7-53:18, 57:15-58:4, 61:16-61:20, 71:10-71:21. Rosario claims that she did not decide whether to approve or deny a claim, but left that determination up to her supervisor. Rosario 57:24-58:1, 63:16-64:22. Rosario claims she managed to avoid making a single decision or recommendation, or offering any opinion, throughout the entire PIP claim process. Rosario 63:2-71:21, 93:16, 162:2-163:16. Even after being placed on a formal warning in part due to her failure to "think[ ] critically" and "adapt[ ] to each different claims situation," Rosario still claims she chose not to make any independent choices. Rosario 165:5-165:7; Rosario Ex. 16. And while Sousa received "Extraordinary" ratings on his evaluation for "Working Independently" (Sousa Ex. 11), an observation that is supported by his numerous admissions during his deposition as to the work he performed, he simultaneously alleges he just verified information, and others made the claims decisions, Sousa 61:11-61:18 ("I would not go as far as stating [a] recommendation, I would go as far as stating facts into the claim. . . . Either way to deny or extend, then that would be left to management[.]").

The testimony of  Rosario and Sousa that they refused to do anything other than the mindless retrieval and verification of information, devoid of any analysis or thought, and without regard to the published job requirements or the admonitions in their own performance evaluations—is nothing like the job they and the other Plaintiffs were hired to do. For example, Hatoum, Tirado, and Walker testified *they* decide whether to approve

or deny a claim, and regularly exercise discretion in doing so. Hatoum 98:23-98:24 ("I'm making a determination—yes, as to whether [the claim] is to be paid or not."); Tirado 36:20-36:23 ("When I *adjust* the claim, I review the information that's presented to me when the claim is received and make a determination based on the facts of loss.") (emphasis added); Walker 35:23-36:1 (made "decision" whether or not to afford coverage).[3]

To be clear, Progressive submits that the evidence demonstrates conclusively that all Plaintiffs were properly classified as exempt. (Doc. 125 and Doc. 134). Rosario's and Sousa's claims about the tasks they allegedly did or did not perform is contrary to the numerous admissions they made during their respective depositions, their ClaimStation notes and evaluations, Progressive's written expectations for the role, and the testimony of numerous other Plaintiffs—and should not defeat summary judgment as to them or any other Plaintiff. But Plaintiffs cannot deny they have proffered disparate proof. As a result of this disparate and varied testimony, if summary judgment is denied, the trial would turn on Plaintiffs' individual testimony regarding their primary duty, and they cannot even agree on what that was. Most Plaintiffs testified they perform the exempt job they were hired and expected to do. Others, like Rosario and Sousa, claimed they did not.

### C.  Plaintiffs Do Not Agree On The Use Of Resources And Templates

In opposing summary judgment, some Plaintiffs claim they are required to use templates and other job aids that direct their every action and eliminate any independent

---

[3] Some Plaintiffs tried to avoid admitting they "decided" whether to approve or deny claims, and instead testified they made coverage "recommendations." Silas 45:22-46:5; Joiner 59:22-60:16, 122:19-122:22. This distinction is irrelevant. "Recommendations" are as much an exempt function as "decisions." 29 C.F.R. § 541.202(c) ("[D]ecisions made as a result of the exercise of discretion and independent judgment may consist of *recommendations* for action rather than the actual taking of action.") (emphasis added).

thought. According to Rosario, templates "tell us exactly [what] we are supposed to do step by step" and the specific information needed to process a claim. Rosario 44:6-44:9, 50:15-54:25, 57:12-58:1, 63:2-73:24, 72:21-72:23; *see also* Silas 114:14 ("We use templates just about for everything."). Yet, other Plaintiffs testified they are not required to use templates or job aids, or any template or job aid, on every claim. Sousa 137:5-137:24 (he decided whether to use job aids and which job aid to use, and he did not use job aids that "would not pertain to that [claim] specifically"); Joiner 165:4-166:4 (she committed investigative steps to memory and only refers to templates if she has questions); Hatoum 133:19-133:22 ("Q: Part of your role as the med rep in investigating claim is determining which job aid would make sense to refer to in that situation, right? A: Right.").[4] Notably, Plaintiffs have not produced a single Progressive template providing a step-by-step answer to the handling of even the most routine claim. That is because, as Garretson testified, no template can cover every possibility. Garretson 47:16-47:18. All this in mind, the conflicting testimony certainly warrants decertification if the Court were to deny summary judgment.

### D. Plaintiffs Do Not Agree On The Supervision They Experience Or The Scope Of Their Discretion And Independent Judgment

In addition to the varied testimony regarding the extent to which they make coverage decisions and their use of job aids, Plaintiffs also disagree about the supervision

---

[4] As detailed in Progressive's summary judgment briefing, Plaintiffs' use of templates does not create a material issue of fact precluding summary judgment. (Doc. 125 at n.10 and Doc. 134 at p. 7). Although Plaintiffs may rely on these tools to facilitate their work and make accurate coverage decisions, none dictate the substance of the decisions they make every day. Sousa 134:23-135:3, 145:14-145:19 (medical rep must decide whether to use approval or denial template and must understand what to do with information once it is entered because "[i]f you are just putting [information] in there . . . just filling it out is not going to help you arise at your decision"). Whether Plaintiffs use these tools or not, the decision to accept or deny coverage remains at all times the responsibility of Plaintiffs.

they experience and the extent of the discretion and independent judgment they exercise.[5]

Initially, most Plaintiffs agree Level 39 medical reps handle claims that are "more complex," and require "more experience" and "more knowledge of the policy." Silas 57:2-57:14; Walker 18:18-18:20, 20:21-21:3; Hatoum 74:17-75:8. Hatoum testified she exercised greater autonomy as a Level 39 medical rep compared to a Level 37, and this increased "autonomy" is what attracted her to the role. Hatoum 62:22-63:6, 101:3-101:9.

But Plaintiffs report different supervisor expectations and control depending on the individuals involved, which impacts how they process claims. Silas testified "some supervisors, they want more control." Silas 82:4-82:5. Hatoum testified one supervisor was a "micromanager" and wanted her to use "exact template[s]," while another was "more flexible" and "trusted" her "to be able to handle the claims the way they were supposed to be handled." Hatoum 44:14-45:4, 134:24-135:5. Tirado agreed "[d]ifferent supervisors have different expectations" for medical reps and supervisors "manag[e] differently based on personalities." Tirado 89:9-89:12, 90:8-90:10. As to whether a medical rep needs approval to refer a claim to SIU, for example, Tirado testified "[i]t all depends . . . on your supervisor" and "it's never consistent." Tirado 88:12-88:25; *see also* Joiner 129:15-129:18 ("Q: . . . So different supervisors might give out different levels of authority? A: Right. They don't require you to write things up to them, yes.").

Additionally, while the evidence establishes that Plaintiffs of all levels were expected to, and did, exercise considerable discretion and independent judgment, several

---

[5] While these differences support decertification, they do not create a material issue of fact precluding summary judgment because, regardless of which supervisors Plaintiffs reported to or their specific process for completing their claims investigations, all Plaintiffs testified that they exercised sufficient discretion and judgment to qualify for the exemption.

Plaintiffs testified they enjoyed even greater autonomy as they gained more experience. Hatoum 61:8-61:16 (needed less supervisory guidance as she gained experience and eventually needed only "minimal direction"); Garretson 30:14-30:16 (less experienced rep may have more claims recommendations rejected); Joiner 81:18-81:22 (elevated issues to supervisor more often when she first started); Walker 70:9-71:11 (same).[6]

Some Plaintiffs reported greater levels of discretion and independent judgment to make particular claims decisions than other Plaintiffs. As just a few examples:

- **Evaluating Causation.** Some Plaintiffs confirm they evaluate whether the alleged injuries are consistent with and causally related to an automobile accident. Silas 55:16-55:20 ("Q: . . . Is that something that you need to -- ever need to decide or determine when handling claims, whether there's a causal connection between the injury and the use of the motor vehicle? A: Yes[.]"); Sousa 20:11-21:6 ("If -- when investigating the claim and reviewing medical notes, . . . if there was a medical event such as a heart attack [that] just happened to have taken place in a car, . . . a motor vehicle accident may not have been the cause of the heart attack. . . . [I]f the only treatment rendered was due to the heart attack, it would be something to further investigate causation of said treatment or injury."); Walker 37:22-37:25 ("Q: So why would you be reviewing medical records? A: To determine if further treatment is reasonable, or related, or necessary, to determine if we are going to schedule an independent medical exam."). Others deny having made any

---

[6] Likewise, Sousa, who often acted as de facto manager, testified he more frequently accepted recommendations from more tenured medical reps. Sousa 63:22-64:4 ("There could be a brand-new representative that I would disagree with their investigations more often versus a tenured representative where I would disagree with their investigation a lot less. So it all depends on the representative and the level of their investigation, the level of their tenure.").

causation determinations. Hatoum 85:9-85:12 ("Q: Did you also have to make a determination on whether the injury was, in fact, related to the accident? A: That determination didn't lie with me[.]").

- **Ordering IMEs.** Several Plaintiffs testified they order IMEs. Hatoum 101:3-101:6 ("Q: "Were there times as you progressed in your career as a med rep that you obtained that authority to order IMEs without your supervisor's approval? A: Yes."), Tirado 116:8-116:16 ("We make a decision to determine whether an independent examination is needed. . . . I have autonomy for that[.]"); Silas 38:5 ("I would request an IME."); Joiner 60:19-60:24 (determining if IME is needed is part of her job); Garretson 71:14-71:18 (supervisory approval not always needed for IME). Rosario claims "[t]he supervisor had to approve whether or not we do an IME." Rosario 162:4-162:5.

- **Clearing CVQs.** Some Plaintiffs testified they have authority to clear CVQs. Tirado 38:12-38:15 (determined how to resolve coverage issues); Hatoum 63:24-64:13 (had authority to create and clear certain CVQs); Joiner 170:22-171:9 (same). Rosario claims only a manager could do so. Rosario 168:21.

- **Conducting Interviews.** Many Plaintiffs testified they tailor their interview questions and approach to the specific claim and the claimant's responses. Hatoum 56:9-56:24, 59:4-60:8 (adjusted questions she asked "on the spot" based on claimant's responses); Joiner 68:1-68:4, 78:4-78:14 (questions she asks depend on claim, and she must change tone or approach depending on who she is speaking with, which is "not in a template"); Garretson 47:21-48:15 (determined which "style" and "approach" to take with customers to get accurate answers);

Tirado 86:3-86:14 (every interview is different and she must use different skills to get information needed to resolve claim); Walker 73:14-74:18 (some are more cooperative, while others are more evasive, and she adjusts approach and/or method of contact accordingly). By contrast, Rosario and Silas claim they always adhere to templates in interviews. Rosario 73:20-73:21 ("[W]e ask the questions that Progressive tells us to ask."); Silas 53:3-53:7 ("[W]e have a list of questions. You pull out that template and you ask those questions, you get a recorded statement, . . . ask the questions, and then submit it to be reviewed by the supervisor.").

- **Referring Claims to SIU**. Many Plaintiffs testified they decide whether to refer potentially fraudulent claims to SIU. Joiner 75:23-76:7 ("I sent the claim [with red flags] to our -- we have a fraud division. . . . I made a decision to refer it."); Silas 39:21-40:4 (if fraudulent attributes are present, she transfers claim to fraud department; Tirado 24:21-25:8 (same). To the contrary, Sousa testified his supervisor made that decision. Sousa 19:17-20:1 ("leadership" referred claim to SIU "if they found it necessary").

The fact that Plaintiffs worked for different supervisors with allegedly different tendencies, and allegedly completed some job duties differently than other Plaintiffs, should not defeat the finding that—considering their job duties as a whole—all Plaintiffs exercised sufficient discretion and independent judgment to qualify for the administrative exemption. *See Brown v. Nexus Bus. Sols., LLC*, 29 F.4th 1315, 1318 (11th Cir. 2022) ("Whether an employee exercises the required level of discretion is ultimately a holistic determination."). But if the Court disagrees and denies summary judgment, the only way

to determine whether Plaintiffs exercise the required discretion and judgment is to ask each of them. In such an individualized case, decertification is warranted.

**E.**   **Sousa And Hatoum Also Took On Unique Supervisory Duties Further Distinguishing Them From Other Plaintiffs**

Sousa and Hatoum testified that, during part of the period for which they are seeking unpaid overtime, they took on unique supervisory duties that required them to exercise even greater discretion and independent judgment. Specifically, both testified they spent *months* acting as "qualified substitutes" (de facto managers who supervise teams of medical reps when their regular supervisors are on vacation or a leave of absence) or leading training courses for new medical reps. Hatoum 17:7-18:4, 65:6-65:8; Sousa 12:24-13:5; 16:25-17:9, 38:2-38:21, 48:12-48:18; 51:24-52:11. When Sousa and Hatoum performed these functions, the amount of time they spent on their medical rep duties declined significantly, and most (if not all) of their claims were reassigned to other medical reps. Sousa 52:14-52:24 ("I did two full approximately ten-week courses where I was the leader instructor. . . . During those ten weeks . . . [m]y title was still a level 39 intermediate associate. There was no title change, just trainer. That was my full-time responsibility in those periods."); *see also* Sousa 37:19-38:1, 52:19-53:22; Hatoum 35:9-36:6, 70:6-71:6. Additionally, both reported having greater autonomy as qualified substitutes. Sousa 29:25-30:10, 34:8-35:7 (as qualified substitute, had greater authority to clear CVQs and make coverage decisions); Hatoum 74:4-74:8 ("Q: Would it be fair to say that during those periods of time when you are acting as a supervisor, that you are, in fact, exercising more autonomy than when you are in your med rep role? A: Yes.").

That is because, as Sousa explained, qualified substitutes "step into [the leader's] shoes and lead the team in that absence." Sousa 176-17:9.

In addition to acting as a de facto manager at various times during his employment as a medical rep, Sousa spent five months "leading a team of administrative support representatives," who input claims and handle administrative tasks for various claims departments. Sousa 45:19-46:14. Sousa testified that, while he remained classified as a Level 39 medical rep, he handled no PIP claims during this time. Sousa 47:9-47:12.

The unique supervisory duties Sousa and Hatoum performed further distinguish them from the other Plaintiffs and underscore that—if summary judgment is denied—the Court must conduct an individualized inquiry to determine whether Plaintiffs were properly classified as exempt.

## IV.  ARGUMENT

### A.  Plaintiffs Have The Burden Of Demonstrating This Case Should Proceed As A Collective Action

Although Progressive is bringing this motion, the burden falls on Plaintiffs to establish they are similarly situated to a degree sufficient to justify a collective trial. The burden at this second stage is "heavier" than at the first "conditional" certification stage. *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007), *cert. denied*, 553 U.S. 1093 (2008).

In deciding a motion to decertify, courts consider: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant that appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Id*. "[T]he court must determine whether, based upon the particular facts of the case, the similarities among the putative class members are sufficient so that it is

more practical, efficient, and fair to proceed as a collective action rather than requiring separate actions." *Harapeti v. CBS Tel. Stations, Inc.*, No. 20-CV-20961, 2022 WL 447220, at *3 (S.D. Fl. Jan. 31, 2022), *report and recommendation adopted* 2022 WL 446956 (S.D. Fl. Feb. 14, 2022); *see also Thomas v. Waste Pro USA, Inc.*, No. 8:17-cv-2254-T-36, 2020 WL 13133635, at *5 (M.D. Fl. July 6, 2020) (decertifying because "there are substantial factual differences between the Opt-In Plaintiffs that would render proceeding as a collective both unmanageable and unfair"). "[L]ogically the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." *Anderson*, 488 F.3d at 953. "[A]s more legally significant differences appear amongst the opt-ins, the less likely it is that the group of employees is similarly situated." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008). If a motion to decertify is granted, the opt-in plaintiffs are dismissed from the action without prejudice. *Thomas*, 2020 WL 13133635, at *3. For the reasons below, this case cannot be fairly or efficiently tried as a collective action.

### B.   Plaintiffs' Alleged Disparate Employment Circumstances Require Decertification

#### 1.   Courts Recognize Application Of The Administrative Exemption Requires A Highly Individualized Analysis

The issue in this case is whether Plaintiffs were exempt from overtime under the FLSA's administrative exemption. An employee falls within the exemption if he is paid on a salary basis of at least $684 per week and his "primary duty" (1) consists of office or non-manual work directly related to the management or general business operations of the employer; and (2) includes the exercise of discretion and independent judgment as to matters of significance. 29 C.F.R. § 541.200(a). The application of this exemption may turn on the relative importance of an employee's exempt duties as compared with other

duties, the time spent on exempt work, and the relative freedom from direct supervision. 29 C.F.R. § 541.700(a). As such, the Department of Labor's regulations instruct courts to perform "a case-by-case assessment to determine whether [a given plaintiff's] duties meet the requirement for exemption." 69 Fed. Reg. 22122, 22144 (Apr. 23, 2014). This highly-individualized analysis is inconsistent with collective treatment.

In collective action cases challenging the plaintiffs' exempt status, courts across the country have recognized the difficulty in allowing the case to proceed on a collective basis. *See*, *e.g.*, *Yoder v. Florida Farm Bureau*, 446 F. Supp. 3d 956, 960-66 (N.D. Fl. 2020) (denying certification because plaintiffs' declarations described different experiences in how they performed job duties and varying levels of manager supervision and control, and whether they were properly classified as exempt from overtime required "individualized determinations"); *Julian*, 2021 WL 3887763, at *3 (decertifying collective of claims specialists because some plaintiffs had "varied experiences" in regard to their exercise of discretion and judgment); *Bradford v. CVS Pharm., Inc.*, 308 F.R.D. 696, 700 (N.D. Ga. 2015) (decertifying collective because "[t]he differences in the duties performed by the various Plaintiffs, as well as the varying degrees of discretion and independent judgment they each exercised, will make individualized inquiries inevitable" when determining whether the administrative exception applies); *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1103 (D. Kan. 2012) (decertifying collective because "[t]he evidence varies as to the nature and variety of decisions made by Plaintiffs, how they ran their respective stores, their authority to make independent choices, and the degree to which their recommendations were considered or reviewed at a higher level, weighing against proceeding collectively"); *Odem v. Centex Homes*, No. 3:08-cv-1196,

2010 WL 424216, at *2 (N.D. Tex. Feb. 4, 2010) (where administrative exemption is at issue, "denying class certification is the simplest and most efficient way to . . . avert the murkiness – and extensive additional cost – of carefully extracting with surgical precision the plethora of dissimilar opt-in[s]"); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003) (decertifying collective of claim adjusters because the "merits of [their] claim will turn upon evidence relating to [their] day-to-day tasks").[7] This Court, if it denies summary judgment as to any Plaintiff, should similarly conclude that decertification is necessary here due to all the varying descriptions of the medical rep job and the unique nature of several Plaintiffs' experience.

## 2.      Plaintiffs Cannot Establish They Are Similarly Situated

Initially, the alleged differences in how a handful of Plaintiffs claim they perform their job as a medical rep—even if those differences are sufficient to create a material issue of fact in regard to those Plaintiffs—cannot defeat summary judgment against other Plaintiffs. *See Julian*, 2021 WL 3887763 (after finding plaintiffs' varied experiences warranted decertification, court granted summary judgment against a remaining named plaintiff). On the other hand, these differences compel decertification. Thus, if the Court denies summary judgment, the varied level of discretion and independent judgment Plaintiffs claim to exercise (or not to exercise) and the varied level of supervision they

---

[7] If the Court grants summary judgment against named Plaintiffs Rosario and Silas, they cannot be similarly situated to other members of the collective who claim they are misclassified, and this collective must be decertified. *See Cameron-Grant v. Maxim Healthcare Serv., Inc.*, 347 F.3d 1240, 1249 (11th Cir. 2003) (named plaintiff without viable claim has no right to represent others); *Moore v. Fred's Stores of Tenn., Inc.*, No. 05-cv-133, 2006 WL 2374768, at *4 (M.D. Fla. Aug. 16, 2006) (dismissing opt-in plaintiffs' claims upon dismissal of individual claims of named plaintiff).

claim to exist (or not to exist), *supra* Section III.B-E, must defeat a finding that Plaintiffs are similarly situated on the central issue of whether they are exempt.

Specifically, Plaintiffs reported greater levels of discretion and independent judgment based on whether they worked as Level 37 or Level 39 medical reps, their individual experience level and work performance, their supervisor's preferences, and whether they took on unique supervisory duties. Indeed, in the absence of consistency among all eight testifying Plaintiffs, it becomes impossible to extrapolate the evidence to cover any non-testifying Plaintiff. For example, is a non-testifying Plaintiff similar to Rosario and Sousa, who claim they mindlessly gathered and verified information and never made any decisions, or similar to Hatoum, Tirado, Walker, Silas, and other Plaintiffs who admit they made important claims decisions and worked with great independence? There is no way to know absent individual determinations.

In other cases involving overtime exemptions, courts have found the same type of disparate employment circumstances that exist in this case warranted decertification. *See*, *e.g.*, *Julian*, 2021 WL 3887763, at *3 (decertification appropriate because "while the Claim Specialist position at Metlife generally involved the exercise of discretion and independent judgment, . . . [some] Plaintiffs have testified that they were managed or supervised in a way that absolved them of all decision-making"); *Yoder*, 446 F. Supp. 3d at 964 (decertification warranted because "the employee's relative freedom from direct supervision . . . will need individualized consideration"); *Harper v. Gov't Empls. Ins. Co.*, No. CV 09-2254, 2015 WL 9673810, at *5 (E.D.N.Y. Nov. 16, 2015), *report and recommendation adopted* No. 2:09-cv-02254, 2016 WL 98516 (E.D.N.Y. Jan. 6, 2016) (decertifying collective of claims representatives because "the record feature[d] conflicting

testimony of plaintiffs' job duties despite GEICO's common job description and performance criteria for [the position]" and "reveal[ed] conflicting testimony regarding how closely GEICO supervisors monitor [plaintiffs'] investigations"); *Bradford*, 308 F.R.D. at 699 (decertifying class of loss prevention managers because "different Plaintiffs took on various, unique duties" such that their primary duties differed from those of other opt-ins, and these differences "will make individualized inquiries inevitable when determining whether [the administrative exemption] applies"); *Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1061 (D. Minn. 2011) (decertifying collective where consultants were slotted into different levels by experience, with consultants at "higher levels [having] more responsibilities"). So to here, the alleged factual dissimilarities (as Plaintiffs describe them) require decertification.

### 3. The Mere Classification Of Plaintiffs As Exempt Cannot Establish A Common Theory Of Liability

Plaintiffs may argue any differences among them are eliminated by their common classification as exempt employees. But as dozens of courts have held, classifying a group of employees as exempt is *not* a basis for certification. *See*, *e.g.*, *Julian v. MetLife, Inc.*, 298 F. Supp. 3d 699, 703 (S.D.N.Y. 2018) (plaintiffs' exempt classification was not sufficient to demonstrate they were similarly situated, and plaintiffs must also demonstrate proposed class had similar job duties to maintain collective action); *Herrera v. Mattress Firm*, Inc., No. 17-22048, 2017 WL 4270619, at *6 (S.D. Fla. Sept. 26, 2017) ("[T]he mere classification of a group of employees . . . as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for [section] 216(b) purposes[.]") (citations omitted); *Palacios v. Boehringer Ingelheim Pharms., Inc.*, No. 10-22398, 2011

WL 6794438, at *6 (S.D. Fla. Apr. 19, 2011) ("If the ultimate issue to be determined is whether the Defendant properly classified each employee as exempt under the FLSA, the 'similarly situated' inquiry must include an analysis of the nature of each putative plaintiff's job duties . . . [which] necessarily involves a fact-by-fact inquiry."). Indeed, "[i]f the rule were otherwise, every case brought before the courts alleging improper designation as non-exempt employees would automatically qualify for conditional class certification." *Julian*, 298 F. Supp. 3d at 703-04 (citation and quotations omitted). In sum, Plaintiffs cannot tie their claims together by relying on Progressive's decision to treat them as exempt.

### 4.    Progressive Has Plaintiff-Specific Defenses

The availability of individualized defenses further weighs in favor of decertification. *See Wright v. Waste Pro USA, Inc.*, No. 0:19-cv-62051, 2022 WL 377869, at *7 (S.D. Fl. Jan. 11, 2022) ("The availability of individualized defenses can make a one-size-fits-all determination . . . impossible."). As noted above, Progressive contends all Plaintiffs satisfy the requirements of the administrative exemption. But as some Plaintiffs deny performing the duties expected of the position (in direct contradiction to their peers), Progressive must build a separate defense for each such Plaintiff. That labor-intensive effort requires an individualized review of how each Plaintiff spent his or her time at work. *Harper*, 2015 WL 9673810, at *6 (decertifying collective because opt-in plaintiffs' conflicting testimony precluded GEICO from proving exemption defense based on "representative proof"); *Cruz*, 764 F. Supp. 2d at 1062, 1064 (decertifying because plaintiffs gave "conflicting testimony regarding the extent to which they independently solve problems" and "[t]hese differences may have significant impacts on the analyses of whether [they qualify for the administrative exemption]"). Sorting fact from fiction will be no easy task for any Plaintiff

whose claim is not dismissed. "[F]or every [Plaintiff] who says one thing about his or her job duties and responsibilities, another says the opposite." *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1133 (N.D. Cal. 2011), *abrogated on other grounds by Campbell v. City of Los Angeles*, 903 F.3d 1090, 1113 n.17, 1120 (9th Cir. 2018) (modifying decertification standard but affirming decertification, and holding "there is no evidence to suggest that the declarants' vaguely reported experience are in fact representative of the experiences of the party plaintiffs Department-wide"). Plaintiffs' contradictory testimony about their job duties guarantees a jury would have to hear from each Plaintiff to decide whether that testimony is credible, a fact fatal to collective action.

Further, Progressive will present evidence demonstrating the testimony some Plaintiffs offered about their job duties is categorically false and contrary to the work they actually performed. In establishing this defense, Progressive must rely on documents and testimony unique to these Plaintiffs, including their own descriptions of their work in their job descriptions, ClaimStation notes, and evaluations, and testimony from co-workers that contradict their version of events. None of this is possible through common proof.

The same plaintiff-by-plaintiff process will need to be repeated on the issue of whether each Plaintiff worked over 40 hours in a week. There is no common evidence that all Plaintiffs worked overtime and no way to efficiently try this issue in one proceeding. *Roberson v. Rest. Delivery Developers, LLC*, 320 F. Supp. 3d 1309, 1320 (M.D. Fl. 2018) (decertifying because, given the variability and lack of evidence of hours worked, "the inquiry into whether overtime hours were worked and minimum wages were paid will be highly individualized"); *Thomas*, 2020 WL 13133635, at *5 ("Whether or not an opt-in plaintiff has worked overtime hours creates a disparate factual setting among the

22

individual Plaintiffs as the issue of liability is not susceptible to common proof."). No Plaintiff kept and submitted records of their hours worked. Joiner 24:8-24:11 (confirming no records); Tirado 97:19-98:12 (same); Walker 68:22-68:24 (same); Hatoum 55:16-55:19 (same). Each Plaintiff must instead rely on their own individualized testimony, about their own alleged work hours, to attempt to prove they worked any overtime hours.

And the testimony regarding the number of hours allegedly worked varied widely from Plaintiff to Plaintiff, based on a multitude of individual factors. For example, in an apparent attempt to undermine the hours reflected in her phone, internet, and ClaimStation data, Rosario testified she frequently worked outside these systems on Microsoft Word. Rosario 115:21-116:1, 216:18-216:24. Yet, numerous other Plaintiffs testified they always log onto these systems and rarely use Word. Tirado 57:15-57:19, 91:16-91:17; Walker 64:22-64:24, 68:6-68:7; Joiner 34:10-34:24, 187:6-187:8. Plaintiffs also provided varying testimony on whether their claim load and/or work hours have decreased (Silas 78:18-80:16; Walker 22:1-22:14; Tirado 27:11-27:19, 76:19-78:6; Joiner 43:1-43:4, 49:10-49:25), increased (Garretson 25:3-25:8), or remained the same (Hatoum 46:3-46:16). Additionally, Garretson testified she sometimes worked during her paid vacation days (Garretson 65:9-65:16), whereas other Plaintiffs testified they rarely, if ever, work on vacation (Silas 87:3-87:8; Joiner 152:21-152:23; Sousa 43:6-43:18; Hatoum 125:13-125:19).

What's more, it is clear from their testimony that some Plaintiffs could not physically have worked the overtime they allege. For example, some Plaintiffs testified they had other jobs or even ran their own businesses while working at Progressive. Rosario 18:5-18:18, 26:7-40:4; Silas 11:1-11:11; Tirado 17:12-18:9; Walker 13:8-13:16, 30:23-31:1.

Others testified they had lengthy commutes up to four hours each day. Tirado 72:5-72:14; Hatoum 20:11-20:13. Progressive will use these facts—which are unique, individualized, and not capable of collective resolution—to demonstrate these Plaintiffs are not entitled to any overtime. The compounding effect of these differences warrants decertification.

### C.   <u>Fairness And Procedural Considerations Also Require Decertification</u>

When considering the third factor of the decertification analysis, courts consider whether tying the collective claims together "is an efficient use of the Court's resources" and whether the court "can coherently manage the class in a manner that will not prejudice any party." *Roberson*, 320 F. Supp. 3d at 1320. Here, efficiency and fairness weigh against proceeding as a collective action. Whether any Plaintiff is entitled to overtime pay, and how much, turns on his or her individualized experience and alleged hours worked, and Progressive's individualized defenses. The unavoidable result—if the case were to be tried as a collective, and liability determined—is that Plaintiffs will be awarded either damages to which they are not entitled, or a smaller amount of damages than they are owed. In *Mathis v. Darden Restaurants*, the court considered this same problem: "Defendants would face all-or-nothing liability for large groups of employees, despite those employees' dissimilar working conditions. Individual opt-in Plaintiffs would not receive recoveries based on their individual experiences. Rather, they would be grouped with other Opt-In Plaintiffs and receive either windfalls or insufficient recoveries." No. 12-61742, 2014 WL 4428171, at *5 (S.D. Fl. Sept. 1, 2014). The district court decertified the action because, "[u]nder those circumstances, a collective action no longer poses benefits in terms of manageability or fairness and is not preferable to individual actions[.]" *Id*. This Court should reach the same conclusion and decertify this collective.

## V.   <u>CONCLUSION</u>

The undisputed evidence establishes that Progressive is entitled to summary judgment against all Plaintiffs. But if the Court denies summary judgment in full or in part, it should decertify this action because Plaintiffs cannot establish they are similarly situated to one another or the other opt-in Plaintiffs. As highlighted in Plaintiffs' opposition brief, resolution of Plaintiffs' FLSA claims will hinge on individualized evidence, credibility and liability determinations, and individualized defenses. The Court should thus decertify this collective action and dismiss all opt-in Plaintiffs without prejudice.

Respectfully submitted,

*s/Kevin W. Shaughnessy*
Kevin W. Shaughnessy, Esq.
Florida Bar No. 0473448
kshaughnessy@bakerlaw.com
Gregory V. Mersol, Esq. (Admitted *Pro Hac Vice*)
gmersol@bakerlaw.com
Amanda L. Godzinski (Admitted *Pro Hac Vice*)
agodzinski@bakerlaw.com
BAKER & HOSTETLER LLP
200 South Orange Avenue, Ste. 2300
PO Box 112
Orlando, Florida 32802 0112
Telephone: (407) 649 4000
Facsimile: (407) 841-0168
***Counsel for Defendant***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 2, 2022, the foregoing motion was served by filing it with the Clerk of Court using the CM/ECF system, which will automatically send electronic notification of such filing to all attorneys of record.

*s/Kevin W. Shaughnessy*
Kevin W. Shaughnessy